NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0175n.06
Filed: March 7, 2005

No. 03-4131

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PATRICK J. NAPLES, JR.,

    Plaintiff-Appellant,

      v.

LOWELLVILLE POLICE DEPARTMENT;
WILLIAM H. VANCE, in his individual and official
capacity; VILLAGE OF LOWELLVILLE; JOSEPH
J. ROSSI, in his individual and official capacity,

    Defendants-Appellees.

On Appeal from the United
States District Court for the
Northern District of Ohio

_____/

**Before:**      **GUY and COLE, Circuit Judges; and TARNOW, District Judge.**[*]

     **RALPH B. GUY, JR., Circuit Judge.**    Plaintiff, Patrick J. Naples, Jr., appeals from

the grant of summary judgment entered in favor of defendants, Village of Lowellville

(Lowellville), Joseph Rossi, and William Vance. Plaintiff challenges the district court's

dismissal of his First Amendment retaliation claim. He argues that the district court erred

in holding that an affidavit signed by him in support of a criminal defendant's motion to

disqualify the prosecutor did not constitute protected speech involving matters of public

concern.

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan,
sitting by designation.

Plaintiff also asserts he was deprived of a liberty interest without due process when a memorandum was placed in his personnel file that documented the alleged reasons for the termination of plaintiff's employment as a Lowellville police officer. Plaintiff claims the memorandum falsely accused him of sexually harassing another Lowellville employee. Plaintiff challenges the district court's dismissal of his due process claim for failure to request a name-clearing hearing.

After review of the arguments presented on appeal, the record, and the applicable law, we affirm.

## I.

Plaintiff was employed as a part-time reserve police officer in the Lowellville Police Department. Rossi was the mayor of Lowellville, and Vance was the chief of police.

On June 1, 2001, plaintiff signed an affidavit that was used in support of a motion to disqualify the prosecutor in a criminal case against former U.S. Congressman James Traficant. Plaintiff claims he gave the affidavit as a private citizen because he wanted to assist Traficant "in obtaining a fair criminal trial."

Craig Morford was the Assistant United States Attorney prosecuting the Traficant case. The affidavit described a telephone conversation between plaintiff and Morford. Plaintiff said that he told Morford that a name was missing from 30 federal indictments recently handed down:

> I mentioned the name and then he became very quiet. Morford asked how I knew him and I proceeded to tell him that in the early 80's I was a Leiutenant [sic] with the Mahoning County Sheriff's Dept. in liquor and vice, and I was in charge of investigating this person. We would conduct investigations on establishments that were involved with organized crime within the city of

Youngstown that were not being investigated by Chief Wellington, and this person was one of those. Morford stated that he did know this person but didn't have enough to indict him.

Plaintiff said that he told Morford their conversation "had to stay strictly confidential for how high up in the crime family this person was, I did not need any retribution because the last time that I got close to Altshler and Strollo I had a fire bomb threat at my parent's home and my windows broken out of my car." Plaintiff alleged that Morford did not keep the conversation confidential:

> (It was later found out that Morford did not keep this conversation confidential. He did let a criminal defense attorney know that there may still be a pending investigation on this subject. This criminal defense attorney was defending another person for murder and one of his subordinates for a gambling charge, putting myself and my family in jeopardy.)

The affidavit also described Morford's distrust of local FBI agents:

> My main purpose in calling Morford was to look into improprieties in a local municipal court. As the conversation went on I told him about a drug distributor in Youngstown with connections with law enforcement. I mentioned that I really didn't want to give this information out to just anybody because of the quantity that this person deals with. Craig Morford stated I would have to get together with his FBI agent Jeff Sedlack, I told him that I really don't trust the FBI office in Youngstown because of my past experience with them. Morford tried to assure me that those agents were no longer there, and that you can trust Sedlack, because Morford didn't trust the other FBI agents either. He stated Sedlack was assigned there to help clean that office up or help to clean it's [sic] image up, or something along that line.

> Mr. Morford's further comments and the way he presented the FBI here in Youngstown was not to be trusted, but you can trust Sedlack.

On August 30, 2001, a Youngstown newspaper called *The Vindicator* ran an article on Traficant's motion to disqualify Morford. Part of the article discussed the affidavit and plaintiff's former employment with the sheriff's department:

Naples' affidavit alleges misconduct by Morford, saying he shared confidential information. Also, without being specific, he alludes to wrongdoing by Sheriff Randall A. Wellington when he served as Youngstown police chief.

Naples, who expressed mistrust for FBI agents in Youngstown, said Morford told him to deal with FBI Special Agent Jeff Sadlak [sic], who had been sent here "to help clean up that office."

Naples' personnel file shows that Wellington pulled his reserve deputy commission in April 2000 after giving him the opportunity to resign, which he did. Naples tried to withdraw his resignation by saying he was under mental distress and coerced, but the sheriff rejected it in a return letter, saying the letter only served to underscore his decision to terminate Naples.

Reached at home, Naples said Wellington will say that he didn't pass a polygraph test and that's why he was told to resign. Naples said the sheriff's department won't give him the polygraph results.[1]

After the article was published, plaintiff was removed from the department duty schedule. Plaintiff claims that Vance told him this was done because of the article. On September 10, 2001, Rossi asked Vance to backdate to August 31, 2001, a memo suspending plaintiff because of complaints of police brutality. The memo stated that an internal investigation would be conducted. On October 4, 2001, Vance issued a memo to Rossi stating that the investigation was closed because plaintiff acted appropriately. Plaintiff was not returned to the schedule.

On March 19, 2002, plaintiff filed this action in state court alleging that he had been wrongfully, discriminatorily, and retaliatorily suspended and not scheduled for work. He also alleged that although he had been promised a full-time position, a younger less-experienced individual was hired to fill a full-time position in the police department.

---

[1]According to plaintiff, Wellington was then chief of the Youngstown Police Department. When Wellington later became Sheriff of Mahoning County, he terminated plaintiff's employment with the Mahoning County Sheriff's Department.

Plaintiff alleged denial of free speech, equal protection, and due process under the First, Fourth, and Fourteenth Amendments in violation of 42 U.S.C. § 1983 (counts I and VI); discrimination and wrongful suspension in violation of the Ohio Civil Rights Act and Ohio public policy (counts II and III); and state law claims of breach of implied contract, promissory estoppel, and civil conspiracy (counts IV, V, and VII). Defendants removed the case to federal court and an amended complaint was filed on June 1, 2002, clarifying allegations against Wellington.

On June 12, 2002, Rossi sent a letter informing plaintiff that he was being terminated as a Lowellville reserve part-time police officer effective immediately. The letter did not state any reasons for the termination. On that same day, Rossi prepared a memorandum that was placed in plaintiff's personnel file. The memo stated in pertinent part:

> Several factors have lead [sic] me to the conclusion that Mr. Naples should be terminated as a reserve part-time police officer. Mr. Naples['s] application for employment provides that any omission of fact or misstatement of fact constitutes cause for dismissal. I have received and reviewed a copy of Mr. Naples's background investigation report from the Mahoning County Sheriff's Department. His response to this report calls into question his ability to properly serve the citizens of the Village of Lowellville as a reserve part-time police officer.

> Among other things, Mr. Naples admits that he once made a statement to another individual that he would give that individual title to Mr. Naples's boat if he would "take care" of Mr. Naple[s's] brother-in-law. Mr. Naples attributes this statement to simply "blowing off some steam." Further, he states that when he was 30 years old he had a girlfriend that was 15, but more likely 16 or 17. Mr. Naples also states that he removed left over [sic] material from job sites while working at Peoples. The response to the background investigation report contains further admissions of prior instances of misconduct, and those are outlined in Mr. Naple[s's] response, and that response is attached hereto.

> I have also received information alleging that Mr. Naples sexually harassed a former employee of the Village of Lowellville. Specifically, Mr. Naples made

sexual advances to a former secretary of the Village. The sexual advances were always the same in that Mr. Naples stated that the former secretary did no [sic] know what a real man was until she went out with Mr. Naples. Mr. Naples also repeatedly informed the former secretary that women were always chasing him.

The incidents were bought [sic] to my attention after Mr. Naples was removed from the schedule pending an investigation of his conduct involving a prior arrest. The former secretary expressed relief that Mr. Naples was removed from the schedule because she was bother [sic] by the sexual advances. These incidents were also made known to Councilman Iudiciani at this time. I asked the former secretary why she did no [sic] report these incidents as they were taking place, and she stated she did not want to cause any problems.

The memorandum further discussed incidents of disrespect and insubordination by plaintiff toward Vance.

Plaintiff did not learn of the existence of this memorandum until Rossi's deposition was taken in this case in March 2003. Without requesting either a name-clearing hearing or leave to amend the complaint, plaintiff asserted for the first time in his response to defendants' motions for summary judgment that placement of this memorandum in his personnel file deprived him of a liberty interest without due process of law. In that brief, plaintiff indicated that he sought "'name-clearing,' by way of a trial to a jury, injunctive and monetary relief; and removal of the false and retaliatory public record file entries, after an opportunity to be heard."

The district court granted summary judgment to defendants on all of plaintiff's claims. Plaintiff's appeal pursues only his First Amendment retaliation, due process, and related § 1983 claims.

**II.**

We review *de novo* the district court's grant of summary judgment. *See*, *e.g.*, *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.     First Amendment Retaliation

A government employee does not relinquish all First Amendment rights just by reason of his employment. *City of San Diego v. Roe*, 125 S. Ct. 521 (2004). A government employer, however, can impose certain restraints on its employees' speech that would be unconstitutional if applied to the general public. *Id.*

In *San Diego*, the Supreme Court held that because the employee's speech related to his public employment, then its decisions in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968), and *Connick v. Myers*, 461 U.S. 138, 147 (1983), controlled. The police officer in *San Diego* was discharged in part for selling homemade sexually explicit videos of himself online through eBay. The Supreme Court concluded that the officer's activities and speech related to his employment because he used a police uniform in the videos, and because he made law enforcement references and described himself as "in the field of law enforcement" on the Web site. *San Diego*, 125 S.Ct. at 524. While plaintiff claims that he signed the affidavit at issue in this case in his role as

a private citizen, we find that his actions related to his employment as a police officer. Plaintiff's speech related solely to his activities and knowledge acquired as a police officer.[2]

To establish a First Amendment violation, therefore, plaintiff must first prove that his speech was directed toward an issue of public concern. *Id.* at 525. Second, the plaintiff must show that his interest in making the speech outweighs the public employer's interest in promoting the efficiency of the public services. *Id.* Third, the plaintiff must present sufficient evidence to prove that his speech caused his discharge. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the protected speech was a substantial or motivating factor in the plaintiff's termination, the employer may present evidence that the employee would have been terminated in the absence of the protected speech. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995). Because we find that plaintiff's speech in this case does not address a matter of public concern, no further inquiry is necessary. *See Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988).

Whether an employee's speech addresses a matter of public concern is a question of law. *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *San Diego*, 125 S. Ct. at 525. "[T]he subjective intent of the speaker, while relevant, is not a controlling factor." *Banks*, 330 F.3d at 894. Thus, we generally look to what was said rather than why it was said. *Id.* at 894-95.

---

[2]Defendants deny that plaintiff was suspended or discharged because of the affidavit or the article in the Youngstown newspaper. We have assumed, however, solely for purposes of summary judgment analysis that the affidavit and newspaper article played a role in the decision to discipline plaintiff.

Public concern is "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *San Diego*, 125 S. Ct. at 526. Stated another way, speech involves matters of public concern if it involves issues about which information is needed or appropriate to enable members of society to make informed decisions about their government's operation. *Banks*, 330 F.3d at 893. Speech that touches upon a matter of public concern includes speech that informs the public that the government failed to discharge its governmental responsibilities or brings "to light actual or potential wrongdoing or breach of public trust" on the part of governmental officials or a governmental entity. *Connick*, 461 U.S. at 148.

"[T]he entirety of the employee's speech does not have to address matters of public concern, so long as some portion of the speech touches on a matter of public concern." *Banks*, 330 F.3d at 894. At the same time, however, passing or fleeting references to an arguably public matter will not elevate an employee's speech to a matter of public concern. *Farhat v. Jopke*, 370 F.3d 580, 592-93 (6th Cir. 2004). The employee's speech is protected speech if "the 'focus' of the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker'" is a matter of public concern. *Id.* at 592. The proper inquiry is not what might be "incidentally conveyed" by the speech. *Id.* at 593.

Plaintiff argues that his speech was a matter of public concern because it addressed the fairness of the Traficant prosecution and the operation of state and federal law enforcement. He claims that the affidavit contains allegations of Morford's prosecutorial misconduct and Wellington's wrongdoing when he was Youngstown's police chief. Plaintiff

also points out that the affidavit describes improprieties in a local municipal court, a drug distributor with connections with law enforcement, and Morford's lack of trust in the Youngstown FBI office.

We agree with the district court that plaintiff's affidavit contained no information that could support an allegation of wrongdoing or of breach of public trust by Morford. Instead, the affidavit "relates Mr. Naples'[s] personal frustration with his previous employers and other officials he worked with in the past." The only reference in the affidavit that could possibly constitute prosecutorial misconduct is plaintiff's claim that Morford disclosed a conversation that plaintiff asked be kept confidential. Nothing in the affidavit, however, supports this claim. Plaintiff stated that he asked Morford to keep confidential the fact that plaintiff had investigated a member of a crime family in the early 1980s. Plaintiff then stated that Morford told a defense attorney that there may still be a "pending" investigation of this person. These allegations do not provide evidence of prosecutorial misconduct because, even assuming Morford had agreed to plaintiff's request for confidentiality, there is nothing in the affidavit to show that Morford disclosed any information from his conversation with plaintiff. Plaintiff's investigation occurred nearly twenty years earlier and would hardly be referred to as pending. Because nothing in the affidavit brought to light actual or potential wrongdoing, plaintiff has not shown that he was speaking to a matter of public concern.

Plaintiff also relies on the references to Wellington, alleged improprieties in a local municipal court, and a drug distributor with connections to law enforcement. These are all passing references that were incidental to the communicative focus of the affidavit—which was plaintiff's conversation with Morford. In addition, there is no detail provided about any

of these matters. The single mention of Wellington related to events that were remote in time, and there was no allegation of wrongdoing by Wellington. The passing references to all of these incidental matters did not render plaintiff's speech a matter of public concern. *See Rahn v. Drake Ctr., Inc.*, 31 F.3d 407 (6th Cir. 1994) (the point of the plaintiff's press release was to air employment-related grievances, and a fleeting reference to patient care in the press release did not render the speech a matter of public concern).

The only remaining information in the affidavit were statements that Morford did not trust some FBI agents formerly working in the Youngstown FBI office. The affidavit clearly stated, however, that these FBI agents "were no longer there." Morford further stated that Agent Sedlack, who had been sent to Youngstown to address "image" problems with the Youngstown FBI office, was himself trustworthy. The agents were not identified by name, and there was no indication that they were involved in the Traficant case. The fact that these agents, who were no longer in Youngstown, somehow may not have been trusted by Morford in the past, cannot be a matter of political, social, or other concern to the community because it does not bring to light actual or potential wrongdoing, or breach of public trust. *See Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir.1989).

Because plaintiff has failed to show that his speech was protected speech, we affirm the grant of summary judgment to defendants on the First Amendment retaliation claim.

**B.      Due Process**

"The Fourteenth Amendment forbids state actors from depriving individuals of life, liberty or property without due process of law." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002). For a claim of deprivation of property without due process, a plaintiff must show he

had a property interest in continued employment or a right to continued pay and benefits during a suspension. *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 409 (6th Cir. 1997). Among the liberty interests protected by the Fourteenth Amendment are "a person's reputation, good name, honor, and integrity." *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989). On appeal, plaintiff pursues only a liberty interest due process claim.

Because defamation alone is not enough to invoke a due process liberty interest, "[s]ome alteration of a right or status 'previously recognized by state law,' such as employment, must accompany the damage to reputation." *Quinn*, 293 F.3d at 319 (quoting *Paul v. Davis*, 424 U.S. 693, 711-12 (1976)). Thus, we have held that "when a 'nontenured employee shows that he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name.'" *Quinn*, 293 F.2d at 320 (quoting *Chilingirian*, 882 F.2d at 205). Once a plaintiff establishes five elements identified in *Quinn*, he is entitled to a name-clearing hearing—the denial of which constitutes a deprivation of a liberty interest without due process. *Id.* at 320.

Defendants argue at the outset that nothing in plaintiff's complaint or amended complaint can fairly be read to assert a procedural due process claim based on the denial of a liberty interest by the placement of the July 12, 2002 memorandum in his personnel file. We agree. As our case law makes clear, a procedural due process claim based on a property interest is distinct from one based on a liberty interest. *Ludwig*, 123 F.3d at 411; *see also Brown v. City of Niota*, 214 F.3d 718, 720-23 (6th Cir. 2000). Different interests are protected and different proofs are required to establish a denial of due process.

While plaintiff alleged that he was denied "due process of law," the basis for that claim was the loss of employment through suspension and a wrongful refusal to schedule him for work. In fact, plaintiff's due process claim could not have rested on a denial of a liberty interest resulting from the placement of the memorandum in his personnel file because both the complaint and amended complaint were filed before the memorandum was even written. When plaintiff later learned of the existence of the memorandum during the course of discovery, however, he neither requested a name-clearing hearing from defendants, nor sought leave to amend the complaint to assert a liberty interest procedural due process claim.

Not surprisingly, defendants argued in their motions for summary judgment that plaintiff had no property interest entitled to due process protection because, as an auxiliary police officer, plaintiff was an at-will employee with no statutory right to continued employment. In his response, plaintiff shifted the claim to assert for the first time that his due process claim "proceeds from his liberty interest, as defendants' unconstitutional retaliation against Plaintiff, further, violated his liberty interest because of the maliciously false and disproven public record personnel file entries of June 12, 2002 (including the false sexual harassment claims)." Without further elaboration, plaintiff indicated that he sought to "clear his name" through a trial of the claim. The district court granted summary judgment to defendants on plaintiff's due process claim because, while he had established he was entitled to a name-clearing hearing, he had failed to request one from defendants.

We assume that plaintiff could establish that placement of the memorandum in his personnel file entitled him to a name-clearing hearing. However, because plaintiff failed to request a name-clearing hearing from defendants once he was aware of the memorandum,

we find the district court correctly concluded that plaintiff could not show that he had been

denied the process to which he claimed he was entitled.[3] *Quinn*, 293 F.3d at 324-25; *Brown*,

214 F.3d at 723; *Ludwig*, 123 F.3d at 411.  In addition, although not addressed by the district

court, we further find that this due process liberty interest claim was never properly raised

by plaintiff because he did not seek to amend the complaint and asserted this new claim for

the first time in response to defendants' motions for summary judgment.

Inasmuch as we have affirmed the dismissal of plaintiff's First Amendment and due

process claims, we find no error in the dismissal of plaintiff's claims under 42 U.S.C. § 1983.

**AFFIRMED.**

---

[3]We express no opinion on whether plaintiff can request a name-clearing hearing if the memorandum still remains in his personnel file.